Filing # 65885408 E-Filed 12/28/2017 01:58:27 PM

IN THE CIRCUIT COURT OF THE
TWELFTH JUDICIAL CIRCUIT IN AND
FOR SARASOTA COUNTY, FLORIDA

CIRCUIT CIVIL DIVISION

CASE NO.:

EILEEN BOWMAN, CAROLYN ADAMS
JUDITH GRENIER, FRANCES PAYNE,
JUDITH ENDRESEN-WORTHY,
CURTIS HIRAM, CORNELIUS BREEMES,
FRANZ DEKER, WILLIAM DOLAN,
PHYLLIS FORD, PATRICIA LAMB, and
PEDRO RIVERA MELENDEZ,

       Plaintiffs,

vs.

MERCK & CO., INC., a foreign corporation,
MERCK SHARPE & DOHME CORP., a
foreign corporation; and McKESSON CORP.,
a foreign corporation,

       Defendants.

_____/

## COMPLAINT FOR DAMAGES

      Plaintiffs, by and through their attorneys, MARC J. BERN & PARTNERS LLP, complain

and allege against Defendants MERCK & CO., INC., (hereinafter, "Merck"), MERCK SHARPE

& DOHME, CORP., and McKESSON CORP., and each of them (collectively, "Defendants"), on

information and belief, alleges as follows:

### INTRODUCTION

      1.    Plaintiffs bring this action for personal injuries and damages suffered as a direct

and proximate result of being inoculated with the unreasonably dangerous vaccine, ZOSTAVAX,

intended for the prevention of shingles as manufactured by Defendants.

      2.    The subject of the present matter is the ZOSTAVAX vaccine, intended for the

prevention of herpes zoster; the shingles virus. At all times relevant to this action, Defendants

**Filed  12/28/2017 02:04 PM - Karen E. Rushing, Clerk of the Circuit Court, Sarasota County, FL**

developed, designed, set specifications for, licensed, manufactured, prepared, compounded, assembled, processed, sold, distributed and/or marketed the ZOSTAVAX vaccine to be administered to patients throughout the United States, including Florida.

3.    All named Plaintiffs' claims for damages relate to Defendants' design, manufacture, sale, testing, marketing, labeling, advertising, promotion, and/or distribution of the faulty ZOSTAVAX vaccine.

4.    The Defendants' vaccine that is the subject of this action reached and was administered to all Plaintiffs, by and through their physicians, medical facilities and pharmacies without substantial change in condition from the time they left Defendants' possession.

5.    Plaintiffs, their physicians, and their pharmacists used the ZOSTAVAX vaccine in the manner in which it was intended.

6.    Defendants are solely responsible for any alleged design, manufacture or information defect the ZOSTAVAX vaccine may contain.

7.    Defendants do not allege that any other person or entity is comparatively at fault for any alleged design, manufacture, or informational defect regarding its ZOSTAVAX vaccine.

**PARTIES**

8.    Plaintiff EILEEN BOWMAN at all times relevant to this action was and is a citizen of the State of Florida, residing at 6356 Lichfield Lane, Sarasota, Florida 34241. EILEEN BOWMAN was inoculated with Defendants' ZOSTAVAX vaccine on or about November 12, 2013 at the Walgreens Pharmacy, located in Sarasota, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused EILEEN BOWMAN to contract a persistent strain of herpes zoster. On or about August 19, 2016, EILEEN BOWMAN was treated by Christina Burns, PA, at Anit D. Ford & Associates practice, located in Sarasota, Florida for the onset of a severe vesicular rash, pain and

itching accompanied by weakened immune symptoms, which was diagnosed as severe herpes zoster, or shingles. On or about August 22, 2016, EILEEN BOWMAN sought subsequent treatment from Dr. Anit Ford, M.D. for ongoing and worsening pain and progressive symptoms unresponsive to treatment attempts, at which time she was diagnosed with herpes zoster in the right thoracic dermatome and post-herpetic neuralgia, a chronic condition of pain and nerve damage secondary to zoster infections. EILEEN BOWMAN has been prescribed Tramadol, Vicodin, and Hydrocodone for management of her persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff EILEEN BOWMAN suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff EILEEN BOWMAN has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

9.    Plaintiff CAROLYN ADAMS at all times relevant to this action was and is a citizen of the State of Florida, residing at 2929 Lewis Wood Lane, Tallahassee, Florida 32305. CAROLYN ADAMS was inoculated with Defendants' ZOSTAVAX vaccine on or about May 26, 2010 at Capital Health Plan Urgent Care, located in Tallahassee, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused CAROLYN ADAMS to contract a persistent strain of herpes zoster. On or about June 28, 2015, CAROLYN ADAMS was treated at Tallahassee Memorial Hospital, located in Tallahassee, Florida, for the onset of a severe vesicular rash accompanied by weakened immune symptoms, which was diagnosed as severe herpes zoster, or shingles. CAROLYN ADAMS has been prescribed Acyclovir and Lipoderm for management of her persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff CAROLYN ADAMS suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff CAROLYN ADAMS has

suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

10.    Plaintiff JUDITH GRENIER at all times relevant to this action was and is a citizen of the State of Florida, residing at 360 Fitness Circle, Apartment 5, Melbourne, Florida 32901. JUDITH GRENIER was inoculated with Defendants' ZOSTAVAX vaccine on or about January 18, 2014 at the Publix Pharmacy, located in West Melbourne, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused JUDITH GRENIER to contract a persistent strain of herpes zoster. On or about February 3, 2014, a few weeks after being vaccinated, JUDITH GRENIER was treated at Quality Medical Care, P.A. located in Melbourne, Florida for the onset of a severe vesicular rash accompanied by weakened immune symptoms, which was diagnosed as severe herpes zoster, or shingles. On or about April 17, 2014, JUDITH GRENIER received subsequent treatment at Quality Medical Care, PA, for new and ongoing symptoms of shingles and pain, which was diagnosed as post-herpetic neuralgia, a chronic condition of pain and nerve damage caused secondary to zoster infections. On or about February 11, 2016, JUDITH GRENIER was treated at Quality Medical Care, PA for continued and worsening pain, which was identified as neuralgia that was not able to be adequately controlled by treatment. JUDITH GRENIER has been prescribed Gabapentin, Lipoderm, and Lortab for management of her persistent symptoms and chronic pain. As a direct and proximate result of these malfunctions, Plaintiff JUDITH GRENIER suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff JUDITH GRENIER has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

11.    Plaintiff FRANCES PAYNE at all times relevant to this action was and is a citizen of the State of Florida, residing at 22428 Cheryl Avenue, Port Charlotte, Florida 33954. FRANCES

PAYNE was inoculated with Defendants' ZOSTAVAX vaccine on or about March 22, 2010, as prescribed by Dr. Richard Ruggie, and administered at Phred's Pharmacy, located in Cranston, Rhode Island, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused FRANCES PAYNE to contract a persistent strain of herpes zoster. On or about April 3, 2014, FRANCES PAYNE was treated by Dr. Arturo Rodriguez-Martin, M.D. at his practice located in Port Charlotte, Florida for the onset of a severe vesicular rash accompanied by weakened immune symptoms, which was diagnosed as severe herpes zoster, or shingles. FRANCES PAYNE has been prescribed Valacyclovir for management of his persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff FRANCES PAYNE suffered painful injuries and damages, and required extensive medical care and treatment. As a further proximate result, Plaintiff FRANCES PAYNE has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

12.      Plaintiff JUDITH ENDRESEN-WORTHY at all times relevant to this action was and is a citizen of the State of Florida, residing at 4849 SE Hanson Circle, Stuart, Florida, 34997. JUDITH ENDRESEN-WORTHY was inoculated with Defendants' ZOSTAVAX vaccine on or about January 17, 2008 at the Visiting Nurse Association of Florida, located in Stuart, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused JUDITH ENDRESEN-WORTHY to contract a persistent strain of herpes zoster. On or about August 4, 2016, JUDITH ENDRESEN-WORTHY was treated by Jennifer A. Prom, PA-C at St. Luke's Miller Creek Medical Clinic, located in Hermantown, Minnesota, for the onset of a severe vesicular rash accompanied by weakened immune symptoms, which was diagnosed as severe herpes zoster, or shingles. JUDITH ENDRESEN-WORTHY was due for surgical intervention to treat her breast cancer, but due to her

persistent zoster outbreaks and infections on her chest, her surgery was postponed, causing her cancer to spread. JUDITH ENDRESEN-WORTHY has been prescribed Valtrex and Hydrocodone-Acetaminophen for management of her persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff JUDITH ENDRESEN-WORTHY suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff JUDITH ENDRESEN-WORTHY has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

13.     Plaintiff CURTIS HIRAM at all times relevant to this action was and is a citizen of the State of Florida, residing in Alachua, Florida 32616. CURTIS HIRAM was inoculated with Defendants' ZOSTAVAX vaccine on or about July 18, 2012 at the Walgreens Pharmacy, located in High Springs, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused CURTIS HIRAM to contract a persistent strain of herpes zoster. On or about November 22, 2016, CURTIS HIRAM was treated by Dr. Joseph Thomas Sowder, M.D. at Shands Hospital at University of Florida emergency department, located in Gainesville, Florida for a painful and blistering vesicular outbreak, which was diagnosed as severe herpes zoster, or shingles. CURTIS HIRAM has been prescribed Famiciclovir, Valtrex, Prednisone and Medrol Dosepack for management of his persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff CURTIS HIRAM suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff CURTIS HIRAM has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

14.     Plaintiff CORNELIUS BREEMES was and is a citizen of the State of Florida, residing at 102 Marrero Avenue, Sebring, Florida 33875. CORNELIUS BREEMES was

inoculated with Defendants' ZOSTAVAX vaccine on or about May 6, 2011 at the Dunkirk VA Clinic, located in Dunkirk, New York, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused CORNELIUS BREEMES to contract a persistent herpes zoster virus. On or about August 30, 2016, CORNELIUS BREEMES was treated by Cindy J. Harris, DO, at the Dunkirk VA Clinic, located in Dunkirk, New York, for painful vesicular outbreaks that had been present for a week. CORNELIUS BREEMES was then diagnosed with herpes zoster, or shingles. CORNELIUS BREEMES has been prescribed Tramadol and Gabapentin for management of his persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff CORNELIUS BREEMES suffered painful injuries and damages, and required extensive medical care and treatment. As a further proximate result, Plaintiff CORNELIUS BREEMES has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

15.    Plaintiff FRANZ DEKER at all times relevant to this action was and is a citizen of the State of Florida, residing at 12106 Creole Court, Parish, Florida 34219. FRANZ DEKER was inoculated with Defendants' ZOSTAVAX vaccine on or about March 27, 2008, administered at the office of Dr. Krista Toomre, M.D., located in Sarasota, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused FRANZ DEKER to contract a persistent strain of herpes zoster. On or about January 29, 2012, FRANZ DEKER was treated by Dr. Krista Toomre, M.D. in Sarasota, Florida for a painful and blistering vesicular outbreak, which was diagnosed as severe herpes zoster, or shingles. As a direct and proximate result of these malfunctions, Plaintiff FRANZ DEKER suffered painful injuries and damages, and required extensive medical care and treatment. As a further proximate result, Plaintiff FRANZ DEKER has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

16.    Plaintiff WILLIAM DOLAN at all times relevant to this action was and is a citizen of the State of Florida, residing at 8061 Summersong Court, Springhill, Florida 34606. WILLIAM DOLAN was inoculated with Defendants' ZOSTAVAX vaccine on or about May 16, 2011 at the Florida Department of Health – Pasco County, located in New Port Richie, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused WILLIAM DOLAN to contract a persistent strain of herpes zoster. On or about April 17, 2017, WILLIAM DOLAN was treated by Dr. Anjali Singh, M.D. at Singh Medical Group, located Hudson, Florida for the onset of a severe vesicular rash accompanied by weakened immune symptoms, which was diagnosed as severe herpes zoster, or shingles. WILLIAM DOLAN has been prescribed Valacyclovir, Bactroban, and Prednisone for management of his persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff WILLIAM DOLAN suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff WILLIAM DOLAN has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

17.    Plaintiff PHYLLIS FORD at all times relevant to this action was and is a citizen of the State of Florida, residing at 165 Stratford Lane, West Palm Beach, Florida 33417. PHYLLIS FORD was inoculated with Defendants' ZOSTAVAX vaccine on or about September 20, 2012 at the Walgreens Pharmacy, located in West Palm Beach, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused PHYLLIS FORD to contract a persistent strain of herpes zoster with complications in the eye. On or about June 20, 2016, PHYLLIS FORD was treated by Kevin J. Gilbert, M.D. in West Palm Beach, Florida for the onset of an eye disorder, which was diagnosed as conjunctivochalasis, which is often attributable to zoster infections in the eye. On or about June

22, 2916, PHYLLIS FORD sought subsequent treatment from Dr. Kevin J. Gilbert, M.D. for ongoing and worsening symptoms of vesicular outbreaks, which was diagnosed as herpes zoster, or shingles. PHYLLIS FORD has been prescribed Gentamycin ophthalmic solution and Valtrex for management of her persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff PHYLLIS FORD suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff PHYLLIS FORD has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

18.    Plaintiff PATRICIA LAMB at all times relevant to this action was and is a citizen of the State of Florida, residing at 69 Colony Drive North, Ellenton, Florida 34222. PATRICIA LAMB was inoculated with Defendants' ZOSTAVAX vaccine on or about June 20, 2012 at the University of Michigan Health System, located in Ann Arbor, Michigan, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused PATRICIA LAMB to contract a persistent strain of herpes zoster. On or about February 12, 2012, PATRICIA LAMB was treated by Loretta Putvin-Golding, M.D. at Pinnacle Medical Group in Ellenton, Florida for the onset of a blistering vesicular outbreak, which was diagnosed as severe herpes zoster, or shingles. PATRICIA LAMB has been prescribed Valtrex for management of her persistent and painful symptoms. As a direct and proximate result of these malfunctions, Plaintiff PATRICIA LAMB suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff PATRICIA LAMB has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

19.    Plaintiff PEDRO RIVERA MELENDEZ at all times relevant to this action was and is a citizen of the State of Florida, residing at 4674 Caverns Drive, Kissimmee, Florida 34758.

PEDRO RIVERA MELENDEZ was inoculated with Defendants' ZOSTAVAX vaccine on or about January 21, 2016 at the WalMart Pharmacy, located in Kissimmee, Florida, as recommended for routine adult health maintenance and for the prevention of shingles. The vaccine did not prevent shingles as intended, but rather caused PEDRO RIVERA MELENDEZ to contract a persistent strain of herpes zoster. On or about March 3, 2016, shortly after being vaccinated, PEDRO RIVERA MELENDEZ was treated at Family Physicians of Poinciana, located in Kissimmee, Florida for the onset of a blistering vesicular outbreak, which was diagnosed as severe herpes zoster, or shingles. PEDRO RIVERA MELENDEZ has experienced persistent and uncontrolled shingles eruptions singe being diagnosed, suffering from his infections for nearly one-year in duration. As a direct and proximate result of these malfunctions, Plaintiff PEDRO RIVERA MELENDEZ suffered painful injuries and damages, and required extensive medical care and treatment.  As a further proximate result, Plaintiff PEDRO RIVERA MELENDEZ has suffered and will continue to suffer significant medical expenses, and pain and suffering, and other damages.

20.     At all relevant times to this action, as further detailed herein, Defendants MERCK & CO., MERCK SHARPE & DOHME, AND McKESSON CORP., were engaged in the business of researching, developing, testing, designing, setting specifications for, licensing, manufacturing, preparing, compounding, assembling, packaging, processing, labeling, marketing, promoting, distributing, selling and/or introducing into interstate commerce and into the State of Florida, either directly or indirectly through third parties or related entities, the ZOSTAVAX vaccine, which was to be administered to patients throughout the United States, including Florida.

21.     Defendant Merck & Co. ("Merck"), is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business located at 2000 Galloping Hill Road, Kenilworth, New Jersey.  At all times relevant to this action, Merck researched,

developed, tested, designed, set specifications for, licensed, manufactured, prepared, compounded, assembled, packaged, processed, labeled, marketed, promoted, distributed, and sold the ZOSTAVAX vaccine to be administered to patients throughout the United States, including Florida. Merck has conducted business and derived substantial revenue from within the State of Florida, from including, but not limited to, its business activities related to the ZOSTAVAX vaccine. Defendant Merck had and continues to have substantial contacts with Florida, purposefully availed itself of the privilege of conducting activities and business within the State of Florida, derived substantial revenue from its contacts with the State of Florida, and its conduct in Florida directly relates to Plaintiffs' claim in this action. Plaintiffs' claim arises out of Defendant Merck's contacts with the State of Florida.

22.    Defendant Merck Sharp & Dohme Corp., is a wholly-owned subsidiary of Defendant Merck and part of the Merck family of companies. Merck Sharp & Dohme Corp. is a corporation organized and existing under the laws of the State of New Jersey with its headquarters located at 126 E. Lincoln Ave., Rahway, New Jersey. At all times relevant to this action, through the actions of its wholly-owned subsidiary, Merck, or, based on information and belief, its own actions, Merck, developed, tested, designed, set specifications for, licensed, manufactured, prepared, compounded, assembled, packaged, processed, labeled, marketed, promoted, distributed, and/or sold the ZOSTAVAX vaccine to be administered to patients throughout the United States, including New Jersey. Defendant Merck Sharpe & Dohme Corp. had and continues to have substantial contacts with Florida, purposefully availed itself of the privilege of conducting activities and business within the State of Florida, derived substantial revenue from its contacts with the State of Florida, and its conduct in Florida directly relates to Plaintiffs' claim in this action. Plaintiffs' claim arises out of Defendant Merck Sharpe & Dohme Corp.'s contacts with the State of Florida.

23. Defendant McKesson Corporation (hereinafter "McKesson") is a Delaware Corporation with its principal place of business at 2710 Gateway Oaks Boulevard, Sacramento, California. At all relevant rimes, McKesson was in the business of manufacturing, labeling, selling, marketing, packaging, re-packaging, and distributing the ZOSTAVAX vaccine, on information and belief, the ZOSTAVAX vaccine administered to the Plaintiffs. Defendant does business throughout the United States and in the State of Florida, and regularly, continuously, and presently does business with this State, including manufacturing, marketing, selling and distributing the ZOSTAVAX vaccine. Defendant McKesson had and continues to have substantial contacts with Florida, purposefully availed itself of the privilege of conducting activities and business within the State of Florida, derived substantial revenue from its contacts with the State of Florida, and its conduct in Florida directly relates to Plaintiffs' claim in this action. Plaintiffs' claim arises out of Defendant McKesson's contacts with the State of Florida.

24. Affiliates have provided Merck with support in the development and distribution of the ZOSTAVAX vaccine. McKesson acts as such affiliate and does regularly, and continuously conduct business throughout the State of Florida, including this County.

25. Based upon information and belief, Merck, either directly or through its agents, servants and employees, does business in Florida, and at all times relevant hereto, has sold and distributed the ZOSTAVAX vaccine in Florida.

26. Based on information and belief, Merck advertised its ZOSTAVAX vaccine to patients, doctors and hospitals in Florida and/or other medical facilities located throughout the state of Florida.

27. Based on information and belief, Merck focused special attention and allocated special budgeting to the marketing of ZOSTAVAX in Florida because of the State's expansive population of elder residents in the target age demographic for the vaccine.

28.     Joinder of Plaintiffs in this Complaint for Damages is proper pursuant to Florida Rules of Civil Procedure, Rule 1.210(a), which allows permissive joinder, stating that "all persons having an interest in the subject of the action and obtaining the relief demand may join as plaintiffs." The Rule further states that "persona having a united interest may be joined on the same side as plaintiffs..."  In the present Complaint, all Plaintiffs' claims arise from a common nucleus of fact and joinder is not prejudicial and is conducive to efficiency of based on commonality. Plaintiffs assert a right to relief in respect of or arising out of the same transaction, occurrence, or common nucleus, series of transactions or occurrences, and questions of law and fact common to all such Plaintiffs will arise in the action.

29.     Plaintiffs were influenced by, affected by, or otherwise caused to use and consent to being inoculated with the Defendants' ZOSTAVAX vaccine as a result of virtually uniform and/or identical information provided, as well as representations and material omissions made by Defendants Merck, Merck Sharpe & Dohme, and McKesson, as set forth herein.  This information emanated from the same source, Merck, and was vetted by its copy review department (or equivalent) to ensure uniformity and harmony of the marketing message.  The manner by which such information and representations were received by or otherwise exposed to Plaintiffs and their health care providers and pharmacies was the same and include, but are not limited to, the following:

     a.  The ZOSTAVAX vaccine applications submitted to and relied by the FDA for clearance to commercially market.

     b.  Product information, instructions for use and other labeling materials provided with the ZOSTAVAX vaccine.

     c.  Marketing and promotional materials made available and provided by Defendants' marketing departments to Plaintiffs' health care providers, including, but not limited to:

       i.  Patient brochures provided by Defendants' sales representatives in person,

       ii.  Training seminars hosted by Merck,

      iii.  CME (Continuing Medical Education) materials created, authored and/or provided by Defendants.

      iv.  Information supplied at Professional Conferences at booths hosted or manned by Merck or their Key Opinion Leaders.

d.  Representations and informational packets made and provided by Defendants' marketing and sales departments through their sales representatives to each implanting physician of Plaintiffs' during in-office visits or meetings with said physicians and by pharmacists at the places where they go regularly to obtain other medications.

e.  Defendants' online websites that provided the same specific information on the ZOSTAVAX vaccine, including product description, indications for use, instructions for use, and ordering information.

f.  The indications for use were the same or substantially similar in each Plaintiff's situation, as set forth herein. The Plaintiffs were each urged by their health care providers or pharmacists to get inoculated with the ZOSTAVAX vaccine for the prevention of adult shingles, which they were informed by said providers was a dangerous condition.

g.  Plaintiffs experienced injuries because of the same defects with the ZOSTAVAX, which were known or knowable to Defendants, at all relevant times, but negligently, recklessly, and intentionally withheld from Plaintiffs and their health care providers, as set forth herein.

## JURISDICTION AND VENUE

30.    This is an action for damages in excess of $15,000.00, excluding interest, costs, and attorneys' fees.

31.    This Court has personal jurisdiction over Plaintiffs, each as parties to this action and residents of the State of Florida.

32.    Venue is proper in this Court because venue is deemed proper in the Circuit Court in the county in which cause of action arose, or where any party to the action resides. The actions alleged herein took part in Florida, namely within Sarasota County. Further, a substantial amount of the Defendants' conduct, as alleged herein by Plaintiffs, took place throughout the State of Florida, including within Sarasota County.

33.    Requiring Defendants to litigate these claims in Florida does not offend traditional notions of fair play and substantial justice and is permitted by the United States Constitution.

34.     Moreover, each Defendant systematically availed themselves of the State of Florida by conducting regular and sustained business and engaging in substantial commerce and business activity in Florida, including without limitation researching, developing, designing, setting specifications for, licensing, manufacturing, preparing, compounding, assembling, processing, marketing, promoting, distributing, selling, and/or introducing into interstate commerce in the State of Florida, either directly or indirectly, its products, including ZOSTAVAX vaccine. Defendants, and each of them, expected or should have expected that their acts would have consequences within the United States, specifically, in the State of Florida; Defendants, each of them, derived and, based on information and belief, some if not all continue to derive substantial revenue from their actions, dealings, associations, relationships, or otherwise, as described herein, in connection with the ZOSTAVAX vaccine.

35.     Each of the above-named Plaintiff's claims arise from and relate to Defendants' purposeful avail of the State of Florida because resident Defendants' wrongful conduct in researching, developing, designing, setting specifications for, licensing, manufacturing, preparing, compounding, assembling, processing, marketing, promoting, distributing, selling, ZOSTAVAX vaccines took place, in whole or in part, in the State of Florida.  Therefore, the claims of Plaintiffs relate to and arise from Defendants' explicit contacts and purposeful avail of the State of Florida. Further and independently, McKesson Corporation consented to jurisdiction in the State of Florida by appointing an agent for service of process in this State and by conducting substantial systematic business in this State.

36.     The instant Complaint for Damages does not confer diversity jurisdiction upon the federal courts pursuant to 28 U.S.C. § 1332.  Likewise, federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 is not invoked by the instant Complaint, as it sets forth herein exclusively state law claims against the Defendants.  Nowhere do Plaintiffs plead, expressly or

implicitly, any cause of action or request any remedy that arises under or is founded upon federal law, and any alleged federal rights or remedies are expressly disavowed. The issues presented by Plaintiffs do not implicate substantial federal questions, do not turn on the necessary interpretation of federal law, and do not affect the federal system as a whole. The assertion of federal jurisdiction over claims made herein would improperly disturb the congressionally approved balance of federal and state responsibilities.

### ALTER-EGO, VICARIOUS AND SUCCESSOR LIABILITY, AND PIERCING THE CORPORATE VEIL AS A RESULT OF THE RELATIONSHIPS BETWEEN MERCK, MERCK SHARPE & DOHME, AND McKESSON CORP.

37.    Plaintiffs incorporate by reference all prior allegations.

38.    At all times herein mentioned, Defendants Merck, Merck Sharp & Dohme, and McKesson were agents, servants, partners, aiders and abettors, co-conspirators and/or joint venturers, and were all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to each other, knowing their collective conduct constituted a breach of duty owed to Plaintiffs.

39.    There exists and, at all times herein mentioned, a unity of interest in ownership between Defendants Merck and Merck Sharp & Dohme such that any individuality and separateness between them has ceased and these particular Defendants are alter egos. Adherence to the fiction of the separate existence of these particular Defendants as entities distinct from each other will permit an abuse of corporate privilege and would sanction a fraud and/or promote injustice.

40.    At all times herein mentioned, Merck, Merck Sharp & Dohme, and McKesson were engaged in the business of, or were successors in interest to, entities in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling,

inspecting, distributing, marketing, labeling, promoting, packaging, prescribing, and/or advertising for sale, and selling the ZOSTAVAX vaccine for use by Plaintiffs, their health care providers, and pharmacists. As such, each of these particular Defendants is individually, as well as jointly and severally, liable to Plaintiffs for their damages.

41.    At all times herein mentioned, the officers and/or directors of Merck and Merck Sharp & Dohme mentioned or referred to herein participated in, authorized and/or directed the production and promotion of the aforementioned ZOSTAVAX vaccine when they knew, or with exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that results in the injuries suffered by Plaintiffs.

42.    Plaintiffs would not have an adequate remedy if Defendants Merck Sharp & Dohme and McKesson were not named parties in this action.

43.    Defendant Merck Sharp & Dohme and McKesson exercised, and continues to exercise, complete and domination of the finances, policy, and business practices of Defendant Merck to such an extent that Defendants Merck, Sharpe & Dohme and McKesson have no separate minds, wills or existences of its own.

44.    The aforesaid control was used by Defendant Merck to negligently research, design, formulate, compound, test, manufacture, produce, process, assemble, inspect, distribute, market, label, promote, package, prescribe, and/or advertise, and sell ZOSTAVAX vaccine for use by patients like Plaintiffs, their health care providers, and their pharmacists.

45.    As such, there are sufficient grounds, in and of themselves, for disregarding the corporate form and extending liability to Defendants Merck Sharp & Dohme and McKesson through piercing the corporate veil.

46.    Based on the foregoing, "Merck" where used hereinafter, shall refer to all subsidiaries, affiliates, divisions, franchises, partners, joint venturers, organizational units of any kind, predecessors, successors, assigns, officers, directors, employees, agents and representatives of Merck, and Merck Sharp & Dohme, and each of them.

47.    "Defendants" where used hereinafter, shall refer to all subsidiaries, affiliates, divisions, franchises, partners, joint venturers, organizational units of any kind, predecessors, successors, assigns, officers, directors, employees, agents and representatives of Merck, Merck Sharp & Dohme, and McKesson and DOES 1 through 50, and each of them.

**ESTOPPEL FROM PLEADING STATUTES OF LIMITATIONS OR REPOSE**

48.    Plaintiffs incorporate by reference all prior allegations.

49.    Plaintiffs are within the applicable statute of limitations for their claims because Plaintiffs, and their health care professionals, did not discover, and could not reasonably discover, the defects and unreasonably dangerous condition of the ZOSTAVAX vaccine.

50.    Plaintiffs' ignorance of the defective and unreasonably dangerous nature of the ZOSTAVAX vaccine and the causal connection between these defects and each Plaintiffs' injuries and damages, is due in large part to Defendants' acts and omissions in fraudulently concealing information from the public and misrepresenting and/or downplaying the serious threat to public safety its products present.

51.    In addition, Defendants are estopped from relying on any statutes of limitation or repose by virtue of unclean hands, acts of fraudulent concealment, affirmative misrepresentations and omissions.

52.    Such conduct includes intentional concealment from Plaintiffs, prescribing health care professionals, pharmacists, and the general consuming public and the FDA of material

18

information that ZOSTAVAX had not been demonstrated to be safe or effective, and carried with them the risks and dangerous defects described herein.

53.    Defendants had a duty to disclose the fact that the ZOSTAVAX vaccine was not safe or effective, was defective, unreasonably dangerous, and that being inoculated with the ZOSTAVAX vaccine as a measure of routine health maintenance and prevention carried the above-described risks.

## FACTUAL BACKGROUND

54.    The National Childhood Vaccine Injury Act of 1986 ("Vaccine Act"), 42 U.S.C. §§ 300aa-1 et seq. does not preempt Plaintiffs from filing this Complaint.

   a.  Pursuant to §11(c)(1)(A) of the Vaccine Act, the Vaccine Court has jurisdiction to only hear cases listed on the Vaccine Injury Table.

   b.  The ZOSTAVAX vaccine is not a vaccine listed in the Vaccine Injury Table. At all times hereinafter mentioned, Merck designed, manufactured, licensed, labeled, tested, distributed, marketed and sold the ZOSTAVAX vaccine.

55.    ZOSTAVAX was designed, developed, marketed, and sold with the intended purpose of preventing shingles, which is caused by the varicella zoster virus (VZV).

56.    Varicella zoster is a virus that causes chickenpox.

57.    Once the varicella zoster virus causes chickenpox, the virus remains inactive (dormant) in the nervous system for many years.

58.    VZV can be reactivated due to factors such as disease, stress, aging, and immune modulation caused by vaccination. The reactivated VZV infection of sensory nerve ganglion and the peripheral nerve and its branches persists latently in dorsal root ganglia. Such reactivation causes inflammation of nerve axons as well as vesicular eruptions on skin of involved dermatome.

59.    When reactivated, varicella zoster replicates in nerve cells and is carried down the nerve fibers to the area of skin served by the ganglion that harbored the dormant virus.

60.     In May of 2006, the U.S. Food and Drug Administration ("FDA") approved the ZOSTAVAX vaccine to be marketed and sold in the United States by Merck.

61.     ZOSTAVAX was initially indicated for the "the prevention of herpes zoster (shingles) in individuals 60 years of age and older when administered as a single-dose." FDA Approval Letter, May 25, 2006.

62.     FDA approval was based in large part on the results of the Shingles Prevention Study (SPS) supported by Merck.

63.     The results of the SPS were published in the *New England Journal of Medicine* on June 2, 2005. The paper was titled "A Vaccine to Prevent Herpes Zoster and Post-herpetic Neuralgia in Older Adults". *N. Engl. J. Med.* 2005; 352(22):2271-84.

a.   Shingles results from reactivation of latent varicella zoster virus (VZV), which is the virus that causes chickenpox. The incidence and severity of shingles increases as people age.

b.   As further described in this paper, "[t]he pain and discomfort associated with herpes zoster can be prolonged and disabling, diminishing the patient's quality of life and ability to function to a degree comparable to that in diseases such as congestive heart failure, myocardial infarction, diabetes mellitus type 2, and major depression." *N. Engl. J.Med.* 2005; 352(22) at 2272.

c.   The ZOSTAVAX vaccine is essentially the same vaccine as that used for chickenpox, except significantly stronger.

d.   ZOSTAVAX contains live VZV. The virulence of the virus is reduced or "attenuated." Attenuated vaccines are designed to activate the immune system with the decreased risk of actually developing the disease.

e.   ZOSTAVAX is developed from a live attenuated version of the Oka/Merck VZV vaccine strain.

f.   One of the paper's more significant findings was "[t]he greater number of early cases of herpes zoster in the placebo group, as compared with the vaccine group, and the fact that no vaccine virus DNA was detected, indicate that the vaccine did not cause or induce herpes zoster."

64.     A risk of using a live virus vaccine is that it is not weakened enough or "under-attenuated".

65.     Under-attenuated live virus creates an increased risk of developing the disease the vaccine was to prevent.

66.     Under-attenuated live VZV has been shown to reactivate. Leggiadro, R. J. (2000). "Varicella Vaccination: Evidence for Frequent Reactivation of the Vaccine Strain in Healthy Children." *The Pediatric Infectious Disease Journal*, 19(11), 1117–1118; Krause, P. R., & Klinman, D. M. (2000). *Nature Medicine*, 6(4), 451–454.

67.     Once injected, attenuated live virus has been shown to recombine into more virulent strains causing disease.

68.     Shingles is a reactivation of the latent VZV, that afflicts in nearly 1 million cases annually in the United States, at an occurrence of three to seven times higher incidence in geriatric patients.

69.     The approval granted by the FDA to allow the selling and marketing of this vaccine came with certain post-marketing commitments that Merck agreed to complete, among other things, to insure the safety of this vaccine.  These included the following:

    a.  A randomized, placebo-controlled safety study to assess the rates of serious adverse events in 6,000 people receiving the vaccine as compared to 6,000 who receive a placebo.

    b.  An observational study using a health maintenance organization (HMO) and 20,000 vaccinated people to address safety issues in the course of clinical practice. This study is specifically to detect "potential safety signals following administration of ZOSTAVAX." This study was to be submitted to the FDA by December 2008.

70.     Since the publication of the SPS in the *New England Journal of Medicine*, there have been questions raised regarding the safety of ZOSTAVAX vaccine in scientific and medical journals.

71.     ZOSTAVAX is a stronger, more potent version of Merck's chickenpox vaccine, Varivax.

72.     Varivax contains a minimum of 1,350 PFU (plaque-forming units) of the virus while ZOSTAVAX contains a minimum of 19,400 PFU.

73.     In the clinical studies evaluating ZOSTAVAX, more than 90% of the vaccinated subjects received 32,300 PFU.

74.     MERCK added several adverse reactions to its package insert/prescribing information since Varivax was approved.

    a.  The biological system in which the most adverse reactions were added was the nervous system.

    b.  Added reactions include: encephalitis, cerebrovascular accident, transverse myelitis, Guillain-Barré syndrome, Bell's palsy, ataxia, non-febrile seizures, aseptic meningitis, dizziness, and paresthesia.

    c.  Acute Disseminated Encephalomyelitis is a type of encephalitis.

75.     As of July 2012, the patient information sheet, label, and prescribing information distributed with the ZOSTAVAX vaccine contain no clear reference to the potential risk of viral infection.

76.     Individuals with compromised immune systems should not receive a live virus vaccine because those individuals can develop the disease that the vaccine is designed to prevent.

77.     Instances of zoster virus activation occurs at a rate that is twenty times higher in immunocompromised patients. Immunocompromised patients encompass a wide spectrum of health conditions ranging from HIV, lymphoma and other cancers, bone marrow transplant recipients, or patients in remission or otherwise who had recently been treated with chemotherapy or prednisone. For those who may be immunocompromised, the shingles will have atypical manifestations that are attributable to more severe skin legions, increased severity of pain and more diffuse involvement.

78.     At all times relevant hereto, the patient information sheet, as well as the label and prescribing information for ZOSTAVAX, did not adequately, if at all, address the risk of viral

infection. All that was addressed was the concern that a rash and itching might develop at the injection site. This was despite the fact that shingles was a noted occurrence during clinical trials of the vaccine.

79.    The prescribing information for ZOSTAVAX contains a warning that "[t]ransmission of vaccine virus may occur between vaccines and susceptible contacts."

      a.    The risk of transmission of vaccine virus is due to active viral infection in individuals receiving the ZOSTAVAX vaccine.

80.    Being inoculated with the zoster vaccine too closely to the pneumococcal vaccine ("P23') is known to reduce the immune system's response to the zoster vaccine. Additionally, the CDC states that live-virus attenuated vaccines should not be administered within four weeks of each other. Commonly administered live-vaccines include: Measles, Mumps and Rubella vaccine (MMR); Rotavirus vaccine; Vaccina vaccine; and the Influenza Vaccine ("Flumist:) are all in the category of potential interactions with the ZOSTAVAX vaccine. Receiving any two of these vaccines too closely together can decrease the efficacy of the zoster vaccine. While the prescribing information furnished by Merck mentions decreased efficacy with the pneumococcal vaccine, as of the present, the patient information sheet, label, and prescribing information distributed with the ZOSTAVAX vaccine does not adequately, if at all, address the potential risk of interactions between ZOSTAVAX and other common vaccinations, such as the Flumist influenza vaccination.

81.    At all times relevant hereto, the patient information sheet, as well as the label and prescribing information for ZOSTAVAX, did not adequately, if at all, address the risk of viral infection or possible diseases of the nervous system. This was despite the fact that Varivax, a less potent vaccine, had added several neurological diseases and symptoms as adverse reactions to the Varivax vaccine.

82.    Since ZOSTAVAX's introduction in 2006, Vaccine Adverse Event Reports ("VAERS") appeared in significant numbers addressing various adverse effects, including, but not limited to, viral infection resulting in disease of the central nervous system, including acute disseminated encephalomyelitis.

83.    Documented adverse reactions to vaccines must be reported to the federal government in a compulsory and mandated database, the Vaccine Adverse Event Reporting System ("VAERS".) As of September 2015, there had been 1,111 submissions received of serious adverse event reports regarding the Zoster vaccine, including 36 deaths. These reports included depicting recurrent instances of: myalgia; arthralgia; lymphadenopathy; rash; actinic keratosis; severe cutaneous disease; peripheral neuropathy; cellulitis; herpes keratis resulting in vision loss; facial paralysis; pneumonia; brain inflammation (encephalitis); and death.

84.    Other than post-herpetic neuralgia, shingles can lead to other serious complications, such as scarring, bacterial superinfection, allodynia, cranial and motor neuron palsies, pneumonia, encephalitis, visual impairment, hearing loss, and death.

85.    Since the live vaccine ZOSTAVAX was a mere amplification of the virus already disseminated, patented and widely distributed in Defendants' Varivax (Chickenpox) vaccine, it was likely more cost effective to mass product this duplicative vaccine, rather than to allocate resources and funding to the testing and FDA clearance of a non-live vaccine alternative.

86.    MERCK has knowledge that a non-live vaccine was an effective and medically preferential way to prevent shingles, but it maximized Defendants' profits to pursue a less safe, live-attenuated vaccine with the strain of the virus already cleared for market (in Varivax) and to abandon prior patents and/or research on non-live or inactivated alternative designs.

87.    The Center for Disease Control and Prevention ("CDC") published that the ZOSTAVAX vaccine wanes in efficacy within five years, having almost no remaining

preventative effects after seven years. This allegation is not included on any labeling or packaging literature to alert users of decreased efficacy of the vaccine with time.

88.     The instructions and information published by Merck regarding the ZOSTAVAX vaccine indicate that only one inoculation is recommended. There is no booster vaccine or recommendation to re-vaccine. Patients who received the ZOSTAVAX vaccine do so with the intention to have long-term protection from herpes zoster, although even upon perfect use, the efficacy of the vaccine will decrease significantly after four years (according to the CDC.)

89.     Additionally, unlike ZOSTAVAX, protein-based vaccine alternatives are safe and effective even in immunocompromised patients. Non-live vaccines carry no risk of reactivation inducing shingles after inoculation. Unlike ZOSTAVAX, non-live and inactivated vaccines also maintain efficacy, with 88% lower risk to develop shingles after four years than ZOSTAVAX, which diminishes in efficacy steadily with time.

90.     MERCK knew, or should have known, that the pharmaceutical efficacy and overall safety and overall safety and benefit of an non-live, inactivated, or protein-based vaccine was a safer alternative to the ZOSTAVAX vaccine. The existence of safer alternatives for shingles preventative care, which is widely known to the scientific community, has been tested in clinical trials alongside ZOSTAVAX comparing the efficacy amongst the vaccines, and has shown that such dangers of ZOSTAVAX were known and discoverable, as was a safer and more effective alternative design. MERCK cannot claim that the risks or alternatives were "scientifically undiscoverable" in the context of a state-of-the-art defense.

91.     It follows that given the increased risk of viral infection due to vaccination, such complications are also possible complications of ZOSTAVAX. It also follows that post-vaccination viral infection can cause significant issues in the nervous system due to the replication of the latent virus in the nervous system.

92.     Despite this information and the potential correlation between being administered the ZOSTAVAX vaccine and developing an infection within a relatively short period of time, leading to the development of shingles or varicella-zoster virus pneumonia, Merck failed to properly address and provide this information both to patients and the medical providers prescribing the vaccine.

93.     As a direct result of the vaccine, Plaintiffs suffered, are suffering and/or will continue to suffer from mental and emotional distress due to resulting physical limitations and seriousness of their condition.

94.     As a result of the manufacture, marketing, advertising, promotion, distribution and/or sale of ZOSTAVAX, Plaintiffs sustained severe and permanent personal injuries. Further, as a tragic consequence of Merck's wrongful conduct, Plaintiffs suffered serious, progressive, permanent, and incurable injuries, as well as significant conscious pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, physical impairment and injury.

95.     Plaintiffs have incurred and will continue to incur medical expenses and other economic harm as a direct result of use of ZOSTAVAX.

**COUNT I:**
**STRICT PRODUCTS LIABILITY – DEFECTIVE DESIGN**

96.     Plaintiffs incorporate by reference all prior allegations.

97.     At all relevant times, as set forth, *supra*, Defendants, and each of them, engaged in the business of researching, developing, testing, designing, setting specifications for, licensing, manufacturing, preparing, compounding, assembling, packaging, processing, labeling, marketing, promoting, distributing, selling and/or introducing into interstate commerce the ZOSTAVAX vaccine, and, through that conduct, have knowingly and intentionally placed the ZOSTAVAX

vaccine into the stream of commerce with full knowledge that they reach consumers such as Plaintiffs who would become administered the vaccine.

98.    Merck had a duty to exercise reasonable care in the design, research, manufacture, marketing, testing, advertisement, supply, promotion, packaging, sale, and distribution of ZOSTAVAX including the duty to take all reasonable steps necessary to manufacture and sell a product that was not defective and unreasonably dangerous to consumers and users of the product.

99.    Merck failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of ZOSTAVAX because Merck knew, or should have known, that its product caused viral infection, and was therefore not safe for administration to consumers.

Merck failed to exercise due care in the labeling of ZOSTAVAX and failed to issue to consumers and/or their healthcare providers adequate warnings as to the risk of serious bodily injury, including viral infection, resulting from its use. Merck failed to exercise due care in the labeling of ZOSTAVAX and failed to issue to consumers and/or their healthcare providers adequate warnings as to the risk of serious bodily injury, including viral infection, resulting from its use.

100.    Merck failed to exercise reasonable care in the design, formulation, manufacture, sale, testing, quality assurance, quality control, labeling, marketing, promotions, and distribution of ZOSTAVAX because Merck knew, or should have known, that its product caused viral infection, and was therefore not safe for administration to consumers.

101.    Merck continued to manufacture and market its product despite the knowledge, whether direct or ascertained with reasonable care, that ZOSTAVAX posed a serious risk of bodily harm to consumers. This is especially true given its tenuous efficacy.

102.    Merck knew, or should have known, that consumers, such as the Plaintiff, would foreseeably suffer injury as a result of Merck's failure to exercise ordinary care.

103.    As a direct and proximate consequence of Merck's negligence, Plaintiffs sustained serious personal injuries and related losses including, but not limited to, mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, medical and related expenses, and other losses and damages.

**COUNT II:**
**STRICT PRODUCTS LIABILITY: FAILURE TO WARN**

104.    Plaintiffs incorporate by reference all prior allegations.

105.    Merck designed, researched, developed, manufactured, tested, labeled, advertised, promoted, marketed, sold, supplied, and/or distributed the ZOSTAVAX vaccine.

106.    The ZOSTAVAX vaccine was expected to, and did, reach the intended consumers, handlers, and persons coming in contact with the product with no substantial change in the condition in which the product was designed, produced, manufactured, sold, distributed, labeled, and marketed by Merck.

107.    The ZOSTAVAX vaccine was manufactured, designed, marketed, labeled and sold in a defective condition, for use by the Plaintiff's physicians and/or healthcare providers and all other consumers of the product, making the product unreasonably dangerous.

108.    Merck researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce its ZOSTAVAX vaccine and in the course of same, directly advertised or marketed the product to consumers or persons responsible for consumers, and therefore had a duty to warn of the risks associated with the use of its product

109.    Merck's ZOSTAVAX vaccine, as designed, researched, developed, manufactured, tested, advertised, promoted, marketed, sold, labeled, and distributed by Merck, was defective due to the product's inadequate warnings and instructions. Merck knew, or should have known, and

adequately warned that its product created a risk of serious and dangerous side effects, including but not limited to, viral infection, resulting in shingles, post-herpetic neuralgia, or other diseases of the nervous system.

110.     The product was under the exclusive control of Merck and was unaccompanied by appropriate and adequate warnings regarding the risk of severe and permanent injuries associated with its use, including, but not limited to, the risk of developing a disease in the nervous system due to viral infection. The warnings given did not accurately reflect the risk, incidence, symptoms, scope or severity of such injuries to the consumer.

111.     Notwithstanding Merck's knowledge of the defective condition of its product, Merck failed to adequately warn the medical community and consumers of the product, including the Plaintiffs and their healthcare providers, of the dangers and risk of harm associated with the use and administration of its ZOSTAVAX vaccine.

112.     If the Plaintiffs were equipped with the knowledge of the defective condition and potential harms of the ZOSTAVAX vaccine, they would not have purchased it and agreed to have it injected into their body.

113.     Merck downplayed the serious and dangerous side effects of its product to encourage sales of the product; consequently, Merck placed its profits above its customers' safety.

114.     The product was defective when it left the possession of Merck in that it contained insufficient warnings to alert the Plaintiffs and/or their healthcare providers to the dangerous risks and reactions associated with it, including possible viral infection of the nervous system or another disease of the nervous system.

115.     Even though Merck knew or should have known of the risks and reactions associated with their product, it still failed to provide warnings that accurately reflected the signs, symptoms, incident, scope, or severity of the risks associated with the product.

116.    Regulation of the Federal Food, Drug and Cosmetic Act, 21 U.S.C.S. 301 to 399 ("FDCA") requires labels to be revised as soon as there is reasonable evidence of an association of a serious hazard with a drug; thus, a causal relationship need not be proved when revisions to warning labels have been made.

117.    On or about March 17, 2017, Merck requested FDA approval and regulatory action to issue a clinical efficacy supplement regarding a change in method of production of ZOSTAVAX.

118.    Since May 25, 2006, Merck has requested and received approval on thirteen separate occasions to amend, supplement, revise and otherwise change the warning labels, package insert, efficacy data, intended use, and method of production of ZOSTAVAX. Each regulatory action required by or petitioned to the FDA is sufficient to overcome the rebuttable presumption that the warning labels of ZOSTAVAX are and were adequate.

119.    Plaintiffs used Merck's ZOSTAVAX vaccine as intended or in a reasonably foreseeable manner.

120.    Plaintiffs, each of them, were not informed of the risk of contracting persistent and chronic shingles, the very condition the vaccine was intended to prevent. Moreover Plaintiffs, each of them, were not informed of the risk of contracting shingles, post-herpetic neuralgia, residual nerve pain and damage, or herpetic interference into the eyes, and vision loss.  Given the knowledge of such risk, Plaintiffs would not have voluntarily become inoculated with ZOSTAVAX.

121.    Merck, as a manufacturer of pharmaceutical products, is held to the level of knowledge of an expert in the field and, further, Merck had knowledge of the dangerous risks and side effects of its product.

122.    Plaintiffs did not have the same knowledge as Merck and no adequate warning was communicated to her physicians and/or healthcare providers.

123.    Merck had a continuing duty to warn consumers of its ZOSTAVAX vaccine, including the Plaintiff, of the dangers associated with its product, and by negligently and/or wantonly failing to adequately warn of the dangers of the use of its product, Merck breached its duty.

124.    Although Merck knew, or should have known, of the defective nature of its ZOSTAVAX vaccine, it continued to design, manufacture, market, and sell its product without providing adequate warnings and instructions concerning the use of its product so as to maximize sales and profits at the expense of the public health and safety, in knowing, conscious, and deliberate disregard of the foreseeable harm caused by its ZOSTAVAX vaccine.

125.    As a direct and proximate result of Merck's failure to adequately warn or other acts and omissions of Merck described herein, Plaintiffs were caused to suffer severe and permanent injuries, pain, and mental anguish, including diminished enjoyment of life.

126.    Merck's failure to warn extended beyond the product's label and into other media available to Merck, including but not limited to advertisements, person-to-person sales calls, medical journal articles, and medical conference presentations.

127.    Upon information and belief, the ZOSTAVAX vaccine as manufactured and supplied by Merck, was further defective due to inadequate post-market warnings or instructions because after Merck knew, or should have known, of the risk of serious bodily harm from the administration of its ZOSTAVAX vaccine, including, but not limited to, possible viral infection, Merck failed to provide adequate warnings to consumers and/or their healthcare providers about the product, knowing the product could cause serious injury.

128.    The ZOSTAVAX vaccine, upon information and belief, as manufactured and supplied by Merck, was defective due to inadequate post-market warnings or instructions when it left Merck's control.

129.    As a proximate result of Merck's acts and omissions and the Plaintiffs' use of Merck's defective product, Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses as set forth in this Complaint, including, but not limited to, mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, medical bills and other expenses, and other losses and damages.

**COUNT III:**
**BREACH OF EXPRESS WARRANTY**

130.    Plaintiffs incorporate by reference all prior allegations.

131.    Merck, through its officers, directors, agents, representatives, and written literature and packaging, and written and media advertisements, expressly warranted that its ZOSTAVAX vaccine was safe and effective and fit for use by consumers, was of merchantable quality, did not create the risk of or produce dangerous side effects, including, but not limited to, viral infection, and was adequately tested and fit for its intended use.

a. Specifically, Merck stated that "ZOSTAVAX is a vaccine that is used for adults 60 years of age or older to prevent shingles (also known as zoster)."

b. Merck also stated that "ZOSTAVAX works by helping your immune system protect you from getting shingles."

c. Merck, in the SPS paper, stated that "…the vaccine did not cause or induce herpes zoster."

132.    At the time of making such express warranties, Merck knew and/or should have known that its ZOSTAVAX vaccine did not conform to the express warranties and representations and that, in fact, its product was not safe and had numerous serious side effects, including the possibility of viral infection, of which Merck had full knowledge and did not accurately or adequately warn.

133.   The ZOSTAVAX vaccine manufactured and sold by Merck did not conform to these representations because it caused serious injury, including diseases of the nervous system and/or viral infection, to consumers such as the Plaintiff, when used in routinely administered dosages.

134.   Merck breached its express warranties because its product was and is defective for its intended purpose.

135.   Plaintiffs, through their physicians and/or other healthcare providers, did rely on Merck's express warranties regarding the safety and efficacy of their product in purchasing and injecting the product.

136.   Members of the medical community, including physicians and other healthcare professionals, relied upon Merck's representations and express warranties in connection with the use recommendation, description, and dispensing of Merck's ZOSTAVAX vaccine.

137.   As a foreseeable, direct, and proximate result of the breach of the express warranties, the Plaintiffs suffered severe and permanent personal injuries, harm, and economic loss.

### COUNT IV:
### BREACH OF IMPLIED WARRANTY

138.   Plaintiffs incorporate by reference all prior allegations.

139.   At all times relevant to this action, Merck manufactured, compounded, portrayed, distributed, recommended, merchandised, advertised, promoted, and/or sold its ZOSTAVAX vaccine for use in preventing shingles.

140.   Merck knew of the intended use of its ZOSTAVAX vaccine at the time Merck marketed, sold, and distributed its product for use by the Plaintiffs physicians and healthcare

providers, and impliedly warranted the product to be of merchantable quality and safe and fit for its intended use.

141.    Merck impliedly represented and warranted to the medical community, the regulatory agencies, and consumers, including the Plaintiffs, their physicians, and her healthcare providers, that ZOSTAVAX vaccine was safe and of merchantable quality and fit for the ordinary purpose for which the product was intended and marketed to be used.

142.    Merck's representations and implied warranties were false, misleading, and inaccurate because its product was defective, and not of merchantable quality.

143.    At the time Merck's product was promoted, marketed, distributed, and/or sold by Merck, Merck knew of the use for which it was intended and impliedly warranted its product to be of merchantable quality and safe and fit for such use.

144.    Plaintiffs, their physicians and healthcare providers, and members of the medical community reasonably relied on the superior skill and judgment of Merck, as manufacturer, developer, distributor, and seller of the ZOSTAVAX vaccine, as to whether it was of merchantable quality and safe and fit for its intended use, and also relied on the implied warranty of merchantability and fitness for the particular use and purpose for which the product was manufactured and sold.

145.    Contrary to Merck's implied warranties, its product as used by the Plaintiffs, was not of merchantable quality and was not safe or fit for its intended use because the product was unreasonably dangerous as described herein.

146.    Merck breached its implied warranty because its product was not safely fit for its intended use and purpose.

147.    Merck placed its product into the stream of commerce in a defective, unsafe, and inherently dangerous condition, and the product was expected to and did reach the Plaintiffs without substantial change in the condition in which it was manufactured and sold.

148.    As a foreseeable, direct and proximate result of Merck's acts and omissions and Plaintiffs' use of Merck's defective product, Plaintiffs suffered serious physical injuries and incurred substantial medical costs and expenses to treat and care for their injuries described herein.

## COUNT V:
## FRAUDULENT MISREPRESENTATION

149.    Plaintiffs incorporate by reference all prior allegations.

150.    Merck, by and through its agents and employees will be added following discovery, intentionally, willfully, and knowingly, fraudulently misrepresented to the medical community, the FDA, and consumers, including the Plaintiffs and her health care providers, that its ZOSTAVAX vaccine had been adequately tested in clinical trials and was found to be safe and effective.

151.    Merck knew or believed at the time it made its fraudulent misrepresentations, that its misrepresentations were false and fraudulent regarding the dangers and risks associated with use of its ZOSTAVAX vaccine. Merck made its fraudulent misrepresentations intentionally, willfully, wantonly, and with reckless disregarded and depraved indifference for the safety and well-being of the users of their product, such Plaintiffs.

152.    Merck's fraudulent misrepresentations were made with the intent of defrauding and deceiving the medical community, the Plaintiffs, and the public, and also inducing the medical community, Plaintiffs, and the public, to recommend, prescribe, dispense, and purchase Merck's product.

153.    Merck's fraudulent misrepresentations intentionally concealed the following material information:

a.  Merck represented through its labeling, advertising, marketing material, advertisements, and packaging that ZOSTAVAX had been tested and was found to be safe and effective for preventing shingles;

b.  Merck represented that ZOSTAVAX did not cause or induce shingles;

c.  Merck knowingly omitted in the packaging for this product that the ZOSTAVAX vaccine can actually cause a viral infection, leading to an array of other infections and/or diseases;

d.  Merck represented that ZOSTAVAX was safe, when, indeed, it was not.

e.  Ann Redfield, MSN, RN, working with part of the "vaccine team" as part of Merck's Clinical Safety and Risk Management Department, wrote the comment section for Merck's WAES adverse experience reports.

f.  Ann Redfield also worked as the "process owner" of Merck's Varicella Zoster Vaccine Identification Program. In this capacity, Ann Redfield drafted documents presented to the Merck employees who interacted directly with healthcare providers who recommend, prescribe, and dispense ZOSTAVAX. In addition, Ann Redfield gave presentations to Merck's field personnel, which was the sales force of Merck employees who interacted directly with healthcare providers.

g.  Upon information and belief, on behalf of Merck, Ann Redfield acted within the scope of her employment when she excluded or otherwise ignored reports of meningitis caused by vaccine-strain herpes zoster and assisted Merck in communicating this false information to sales representatives and then healthcare providers. In the alternative, based upon information and belief, Redfield acted beyond the scope of her employment when she misrepresented key safety information, such as excluding or otherwise ignoring reports of meningitis caused by vaccine-strain herpes zoster in her communications to Merck, who in turn communicated this false information to sales representatives and then health care providers.

154.    Merck and Defendants were under a duty to disclose to the Plaintiffs and their physicians and healthcare providers, the defective design and formulation of its product, which design and formulation heightened the risk of suffering the injuries, diseases, and maladies more specifically described in this Complaint.

36

155.    Merck had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous injuries and damages to persons who used the product.

156.    The intentional concealment and omissions of material fact concerning the safety of the ZOSTAVAX vaccine was undertaken purposefully, willfully, wantonly, fraudulently by Defendants Merck, with intent to mislead, with reckless disregard for the health and safety of the Plaintiffs and to induce Plaintiffs' physicians and healthcare providers to purchase, prescribe, administer and/or dispense Merck's product; and to mislead Plaintiffs into reliance upon Merck's fraudulent misrepresentations to use Merck's product as a safe and effective vaccine.

157.    At the time Defendants made these misrepresentations, including Merck through its various officers, directors, agents, representatives, and employees, and at the times the Plaintiffs were administered Merck's product, Plaintiffs were unaware of Defendants' falsehoods, and reasonably believed them to be true.

158.    Defendants knew and had reason to know that the product was at great risk of causing serious personal injury to users of the product, and that the product was inherently dangerous in a manner that exceeded the inaccurate and inadequate warnings given by Merck.

159.    In reliance upon Defendants' false and fraudulent misrepresentations, through her physicians and healthcare providers, the Plaintiffs were induced to, and did, reasonably rely upon Defendants' misrepresentations regarding the safety and efficacy of Merck's product, thereby sustaining severe and permanent personal injuries and damages. Defendants knew and had reason to know that Plaintiffs, their physicians and healthcare providers, in using Merck's product, did not have the ability to determine the true facts intentionally concealed by Defendants, and would not have used the product if the true facts regarding the product had been known by Plaintiffs, their physicians, and their healthcare providers.

160.   As a result of Merck's research and testing or lack thereof, Merck willfully, wrongfully, and intentionally distributed false information including, but not limited to, assuring the Plaintiffs, the public, and Plaintiffs' healthcare providers and physicians, that Merck's product was safe for use. As a result of Merck's research and testing, or lack thereof, Merck intentionally omitted, concealed, and suppressed from the medical community, Plaintiffs, and other consumers the true results of Merck's studies and research, which revealed the true risks of serious harm associated with the use of the product.

161.   Merck had a duty when disseminating information to the public to provide truthful information, and a parallel duty not to deceive the public, the Plaintiffs, their healthcare providers and physicians, and the FDA.

162.   The information distributed by Merck to the public, including the Plaintiffs, the medical community, and the FDA, included, but was not limited to, reports, press releases, advertising campaigns, print advertisements, commercial media containing material representations, which were false and misleading, and contained omissions and concealment of the truth regarding the dangers of the use of Merck's product.

163.   Merck recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of its product to the public at large, and the Plaintiffs in particular, for the purpose of influencing the sales of a product known by Merck to be dangerous and defective.

164.   Defendants' wrongful conduct constitutes fraud and deceit, and was committed and perpetrated willfully, wantonly, and purposefully.

165.   As a foreseeable, direct, and proximate result of Defendants' described acts and omissions, Plaintiffs were caused to suffer the serious and dangerous side effects as are more specifically described in this Complaint.

166.    As a direct and proximate consequence of Merck's fraudulent misrepresentations, Plaintiffs sustained serious personal injuries and related losses including mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, medical and related expenses, and other losses and damages.

### COUNT VI:
### NEGLIGENT MISREPRESENTATION

167.    Plaintiffs incorporate by reference all prior allegations.

168.    Merck had a duty to accurately and truthfully represent to the medical community, the FDA, and U.S. consumers, including Plaintiffs, the truth regarding Merck's claims that Merck's product had been tested, and found to be safe and effective for its stated purposes. The misrepresentations made by Merck, in fact, were false and Merck was careless or negligent in ascertaining the truth of the representations at the time Merck made the misrepresentations.

169.    Merck represented and marketed ZOSTAVAX as being safe and effective.

170.    After Merck became aware of the risks of ZOSTAVAX, Merck failed to communicate to the Plaintiffs and other members of the general public, that the administration of this vaccine increased the risk of viral infection.

171.    Merck failed to exercise ordinary care in making representations concerning its product and its manufacture, sale, testing, quality assurance, quality control, and distribution in interstate commerce. Merck negligently and/or carelessly misrepresented and intentionally concealed the truth regarding the high risk of the product's unreasonable, dangerous and adverse side effects associated with the administration, use, and injection of the product.

172.    Merck breached its duty in representing to the Plaintiffs, their physicians and healthcare providers, and the medical community that Merck's product did not carry the risk of serious side effects such as those suffered by Plaintiffs and other similarly situated patients.

173.    Merck failed to warn the Plaintiffs and other consumers, of the defective condition of ZOSTAVAX, as manufactured and/or supplied by Merck.

174.    Merck negligently misrepresented material facts about ZOSTAVAX in that it made such misrepresentations when they knew or reasonably should have known of the falsity of such misrepresentations. Alternatively, Merck made such misrepresentations without exercising reasonable care to ascertain the accuracy of these representations.

175.    The above misrepresentations were made to Plaintiffs as well as the general public.

176.    Plaintiffs and their healthcare providers, pharmacists and physicians, justifiably relied on Merck's misrepresentations.

177.    Consequently, Plaintiffs' use of ZOSTAVAX was to their own detriment as Merck's negligent misrepresentations proximately caused plaintiff's injuries and monetary losses.

178.    As a foreseeable, direct, and proximate result of Merck's negligent and/or willful, intentional, and knowing misrepresentations as set forth herein, Merck knew, or had reason to know, that Merck's product had not been sufficiently tested, that the product lacked adequate, accurate, and prominent warnings, and that injection with the product created a high risk of adverse health effects, and higher than acceptable risks of harm to users, and higher than reported and represented risks of adverse side effects such as those specifically described herein.

179.    As a direct and proximate consequence of Merck's negligent misrepresentations, the Plaintiffs sustained serious personal injuries and related losses including mental anguish, physical pain and suffering, diminished capacity for the enjoyment of life, a diminished quality of life, diminished ability to work, medical and related expenses, and other losses and damages.

## COUNT VII:
## UNJUST ENRICHMENT

180.    Plaintiffs incorporate by reference all prior allegations.

181.    Merck is and at all times was the manufacturer, seller, and/or supplier of the shingles vaccine, ZOSTAVAX.

182.    Plaintiffs paid for Merck's product for the purpose of preventing shingles.

183.    Merck has accepted payment by Plaintiffs for the purchase of their product.

184.    Plaintiffs have not received the safe and effective vaccine for which they paid.

185.    It would be inequitable for Merck to keep this money if Plaintiffs did not in fact receive safe and effective treatment for the prevention of shingles.

## COUNT VIII:
## STRICT LIABILITY

Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

186.    Defendants manufactured, sold, distributed, marketed, and/or supplied ZOSTAVAX in a defective and unreasonably dangerous condition to consumers, including Plaintiffs, each of them.

187.    Defendants designed, manufactured, sold, distributed, supplied, marketed, and/or promoted ZOSTAVAX, which was expected to reach and did in fact reach consumers, including Plaintiffs, without substantial change in the condition in which it was manufactured and sold by Defendants.

188.    Plaintiffs used ZOSTAVAX as prescribed and in a manner normally intended, recommended, promoted, and marketed by Defendants.

189.    ZOSTAVAX failed to perform safely when used by ordinary consumers, including Plaintiff, including when it was used as intended and in a reasonably foreseeable manner.

190.    ZOSTAVAX was defective in its design and was unreasonably dangerous in that its unforeseeable risks exceeded the benefits associated with its design or formulation.

191.    ZOSTAVAX was defective in design or formulation in that it posed a greater likelihood of injury than other similar medications and was more dangerous than an ordinary consumer could reasonably foresee or anticipate.

192.    ZOSTAVAX was defective in its design and was unreasonably dangerous in that it neither bore nor was packaged with nor accompanied by warnings adequate to alert consumers, including Plaintiffs, of the risks described herein, including, but not limited to, the propensity to induce herpes zoster or shingles, post herpetic neuralgia, herpes zoster keratis, vision loss, residual chronic pain, and scarring.

193.    Although Defendants knew or should have known of the defective nature of ZOSTAVAX, it continued to design, manufacture, market, and sell ZOSTAVAX vaccines so as to maximize sales and profits at the expense of the public health and safety. By so acting, Defendant acted with conscious and deliberate disregard of the foreseeable harm caused by ZOSTAVAX.

194.    Neither Plaintiffs nor their prescribing physicians could have, through the exercise of reasonable care, discovered ZOSTAVAX defects or perceived the extent of the dangers posed by the vaccine.

195.    As a direct and proximate consequence of Defendants' actions, omissions, and misrepresentations, Plaintiffs suffered severe shingles outbreaks, post herpetic neuralgia, herpes zoster keratis, vision loss and other painful impediments. In addition, Plaintiffs required and will continue to require healthcare and services and Plaintiffs have incurred and will continue to incur medical and related expenses as a result of their injuries. Plaintiffs also have suffered and will continue to suffer diminished capacity for the enjoyment of life, a diminished quality of life, increased risk of premature death, aggravation of preexisting conditions and activation of latent conditions, and other losses and damages. Plaintiffs' direct medical losses and costs include care

for hospitalization, physician care, monitoring, treatment, medications, and supplies. Plaintiffs have incurred and will continue to incur mental and physical pain and suffering.

196.    Defendants' conduct as described above was committed with knowing, conscious, wanton, willful, and deliberate disregard for the value of human life and the rights and safety of consumers such as Plaintiffs, thereby entitling Plaintiffs to punitive damages under common law and in accordance with N.J.S.A 2A: 58C-1, so as to punish Defendants and deter them from similar conduct in the future.

### COUNT IX:
### CONSUMER FRAUD

197.    Protection of Florida consumers is codified in the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Commercial behavior that constitutes "unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" is declared unlawful.

198.    In the present matter Merck engaged in continuous and pointed marketing activity and introduced the ZOSTAVAX vaccine heavily into the stream of commerce within Florida and to Florida consumers. Merck engaged in distribution and sales strategy within the state of Florida and intended to reach Florida consumers, including Plaintiffs.

199.    The aggressive marketing campaign, containing advertising techniques that evaded divulging the known serious risks and warnings to consumers, including Plaintiffs, was unconscionable commercial behavior and is impermissible under FDUTPA.

### COUNT X:
### PUNITIVE DAMAGES

200.    Plaintiffs repeat, reiterate, and re-allege each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

201.     Defendant has been repeatedly admonished by the FDA about the manner in which it has marketed ZOSTAVAX to consumers and physicians.

202.     Defendants have repeatedly engaged in a pattern of conduct of deliberately avoiding FDA recommendations as to which warnings relating to public hazards should be included in materials. Defendants have engaged in other similar incidents with other drugs it sells and this evidence tends to show that overstating the benefits of a drug while minimizing the risk of the drug is a pattern and practice of Defendants, which continues even to the present time.

203.     Defendants' acts were willful and malicious in that Defendant's conduct was carried on with a conscious disregard for the safety and rights of Plaintiffs. Defendants' unconscionable conduct thereby warrants an assessment of exemplary and punitive damages against Defendants in an amount appropriate to punish Defendants, and deter similar conduct in the future.

204.     Punitive damages are appropriate under Florida law.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, as follows:

a.     For general damages in an amount to be proven at the time of trial;

b.     For special damages in an amount to be proven at the time of trial;

c.     For statutory damages as set forth above, in an amount to be proven at the time of trial;

d.     For exemplary and punitive damages in an amount to be proven at the time of trial, and sufficient to punish Defendant or to deter Defendant and others from repeating the injurious conduct alleged herein;

e.     For pre-judgment and post-judgment interest on the above general and special damages;

f.     For costs of this suit and attorneys' fees; and

g.     All other relief that this Court deems necessary, proper, and just.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly, severally or in the alternative, for compensatory damages, punitive damages and costs of suit as provided by law.

Respectfully submitted,
**MARC J. BERN & PARTNERS LLP**

By: /s/ Carmen A. De Gisi
CARMEN A. De GISI, ESQ.
Florida Bar No: 97303
MARC J. BERN & PARTNERS LLP
101 W. Elm Street, Suite 215
Conshohocken, PA 19428
Tel: (610) 941-4444
Fax: (610) 941-9880
Primary E-Mail. cdegisi@bernllp.com
*Attorneys for Plaintiffs*